

**ORIGINAL**
FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 17 2008

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

United States, ex rel.          )
                                )
JAMES MICHAEL HARRIS, and       )      CIVIL ACTION FILE
JAMES MICHAEL HARRIS,           )      NO. 1:08-CV-3819
individually,                   )
                                )
            Relator,            )      **TO BE FILED UNDER SEAL**
                                )
v.                              )                 *BBM*
                                )
LOCKHEED MARTIN                 )
CORPORATION                     )
86 South Cobb Drive             )
Marietta, Georgia  30063,       )
                                )
            Defendant.          )

## COMPLAINT

**COMES NOW** *qui tam* Relator, James Michael Harris, on behalf of and in the

name of the United States, and in his own capacity as to Count Three below, and

files this action under seal pursuant to the False Claims Act, 31 U.S.C. § 3729, *et*

*seq.*, showing the Court as follows:

### I. INTRODUCTION

-1-

This is an action under the False Claims Act, 31 U.S.C. § 3729, *et seq.*,

brought by *qui tam* Relator, James Michael Harris, in the name of the United

States, to recover civil penalties and damages arising from Defendant Lockheed Martin Corporation's ("Lockheed" or "Defendant") submission of false statements and false claims to the United States, including, but not limited to, falsifying time records and corresponding labor charges for airplane trim parts (new and replacement) produced in Lockheed's Trim Shops (Flightline Paint and Trim Department) in Marietta, Georgia, and other locations, and submitting the same to the Government.

-2-

Trim parts made by Lockheed for the Aircraft include all upholstery in cargo area and cockpit including, but not limited to, cargo insulation, interior carpeting, insulation, curtains, upholstery, fabric blankets, fabric boots for navigational equipment, fire shield blankets, cockpit canopies, and floor mats.

-3-

The Trim Department also makes and fashions replacement trim parts (called "spares") for airplanes manufactured by Lockheed and placed in service. Lockheed submits claims for payment to the United States for the fabrication of replacement trim parts on a "cost-plus" basis, charging materials and hours of labor for each part, plus overhead and a specified profit.

-4-

From the early 1980s to the present, Defendant continually violated the False Claims Act by submitting claims under contracts with the United States that overcharged the United States for trim parts. As more fully described below, on thousands of occasions, Lockheed inflated labor charges for replacement parts, charged time spent on new parts to orders for replacement parts, charged time spent on one replacement part to another replacement part, charged the Government for "master trim patterns" it did not create, charged the Government for operations it did not perform, and otherwise submitted false statements and false claims to the Government in connection with trim parts ordered by the Government.

-5-

Lockheed concealed from the United States the true amount of the labor costs of manufacturing new and replacement trim parts for the Aircraft. Lockheed hid the overcharges through various schemes described more fully below.

## II. PARTIES

-6-

Relator James Michael Harris is a resident of the State of Georgia and a citizen of the United States. He was employed for 27½ years in the Trim Shop of

the Flightline Paint and Trim Department in Marietta, Georgia, ending in March of 2007.

-7-

Relator held the job classification "Trimmer" (Job Code 548.3) at Lockheed's Marietta, Georgia manufacturing and assembly plant during his employment. Trimmers manufacture, fashion, and install trim parts in Aircraft manufactured by Lockheed—both new planes and planes already in service.

-8-

Relator brings this civil action for and on behalf of the United States for violations of 31 U.S.C. § 3729(a)(1), (a)(2) and (a)(3).

-9-

Defendant Lockheed is a Maryland corporation, with its principal place of business in Bethesda, Maryland. Defendant Lockheed transacts business in the State of Georgia and in the Northern District of Georgia, and maintains offices at 86 South Cobb Drive, Marietta, GA 30063.

### III. JURISDICTION AND VENUE

-10-

Jurisdiction in this action is conferred on this Court by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, as the case arises under the laws of the United States.

-11-

Prior to the filing of this Complaint, there was not any "public disclosure," as that term is defined in the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), of any of the allegations or transactions upon which this action is based.

-12-

Relator has direct and independent knowledge and information of the allegations set out in this Complaint. Prior to filing this action, Relator voluntarily provided such information, together with supporting documentation, in November of 2006, and then to the United States Air Force Office of Special Investigations ("AFOSI") in March of 2007, and finally, in a preliminary Disclosure Statement and "Disclosure Interview" with Government investigators and an Assistant United States Attorney on October 7, 2008.

-13-

Relator's prior disclosures have led to investigations of the artifices described herein in Marietta, Georgia and Greenville, South Carolina.

-14-

Each allegation herein made upon information and belief identifies facts which the Relator, based upon his personal knowledge and 27½ years of

experience working at the Lockheed Marietta facility Trim Shop, has a reasoned factual basis to allege.

-15-

Relator is an "original source" as that term is used in the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

-16-

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because defendant Lockheed transacts business in this District and because the claims for payment under the Aircraft contracts were sent to the United States from and/or processed in this District.

## IV. FACTS

-17-

Since the early 1980s, Lockheed has manufactured new trim and replacement trim parts ("spares") for airplanes assembled in Lockheed's Marietta, Georgia facility, including the F-22 Raptor fighter (including the F/A-22 and F-22A), the C-130 cargo planes (D, E, H, and J), the P-3 Orion, and the C-5 (including C-5A, C-5B and retooling under the C-5 Reliability Enhancement and Re-engining Program (RERP)), all collectively, the "Aircraft."

-18-

The Trim Shops in Lockheed's Marietta location (Department 3015) are responsible for the manufacture of "trim" parts for Aircraft that include, but are not limited to, interior carpeting, upholstery, insulation, curtains, fabric blankets, fabric boots for navigational equipment, fire shield blankets, cockpit canopies, and floor mats. The Trim Shops manufacture such parts for new Aircraft and for Aircraft that have already been delivered to the United States when such parts need replacing or reworking.

-19-

The parts manufactured by the Trim Shops range in price from a few hundred dollars to thousands of dollars, of which labor is generally the primary component.

## A. LOCKHEED'S CONTRACTS WITH THE GOVERNMENT

-20-

Trim parts are made for and installed in new planes under contracts between Lockheed and the United States, under which Lockheed submits claims for payment to the Government based on (1) a fixed cost for each plane or (2) a cost-plus basis, where Lockheed is permitted to charge the Government for reasonable

and necessary material and labor costs for each task involved in production of an Aircraft, plus a fixed amount for profit and overhead.

-21-

The C-130 is manufactured by Lockheed for all branches of the United States Armed Forces, the P-3 Orion is manufactured primarily for the Navy, and the C-5 and the F-22 are manufactured primarily for the Air Force. The Aircraft are also manufactured for foreign countries under arrangements with the United States Government.

-22-

Under the fixed-cost contract for the C-130, Lockheed is paid a fixed amount for production of each plane, without regard to the actual cost of labor and materials (absent a change order). If the production cost of a trim part under a fixed-cost contract exceeds the amount budgeted by Lockheed in its bid for the contract, to protect its profits, Lockheed must find other ways to recover the understated costs, such as charging the excess costs to orders for replacement parts.

-23-

Lockheed's original contract with the United States Air Force to design and develop the F-22 Raptor fighter jet was a cost-plus contract. However, the subsequent production phase of the F-22 program was governed by a series of

"fixed-price" contracts, meaning that the United States paid a set amount for each Aircraft regardless of the actual costs incurred by Lockheed.

-24-

Upon information and belief, Lockheed's contracts with the United States Air Force to design and develop the P-3 Orion fighter jet are cost-plus contracts.

-25-

Lockheed's original contract with the United States Air Force to design and develop the C-5 military transport plane was a cost-plus contract. However, the subsequent production phase of the program, including the RERP, was governed by a series of "fixed-price" contracts, meaning that the United States paid a set amount for each Aircraft regardless of the actual costs incurred by Lockheed.

-26-

The Trim Shop also makes and fashions replacement trim parts (called "spares") for Aircraft manufactured by Lockheed and placed in service. Lockheed submits claims for payment to the United States for the fabrication of replacement trim parts on a cost-plus basis for all Aircraft.

-27-

Orders for spares are generated by the "Loadmaster" in each branch of the service. This Officer is in charge of the interior area (cargo and cockpit) of the

Aircraft. When a need for a replacement part is identified, the Loadmaster places the order up the chain of command in his branch of the Armed Services. The Loadmaster does not know how much the replacement part will actually cost.

-28-

The National Guard buys planes from other branches of the Armed Services at their half life. Lockheed maintains all trim patterns and designs to outfit and maintain Aircraft for the National Guard and submits claims to the Government for production of spares used in National Guard Aircraft. Upon information and belief, Lockheed sells "spares" to the National Guard on a cost-plus basis.

## B. LOCKHEED'S TIME AND BILLING SOFTWARE

-29-

Lockheed uses a software package called "Shop Floor Manager" to track time and labor expended on the fabrication of specific trim items for new Aircraft and for fulfillment of orders for trim items for Aircraft already in service.

-30-

When a request for a trim part is received by the Trim Shop, the Company opens a billing file for that specific part under an "Order Number." This procedure is used for production of both new and replacement parts. The Order Number is the identifier for the electronic file that shows which employees' time was billed to

Page 10

fulfillment of a certain order and how much time each employee billed to that file. Tasks are divided into "operation steps" with labor charged to each step.

-31-

Order Number files for the Trim Shop maintained in Shop Floor Manager consist of a series of tasks or operation steps that are identified in numerical sequence. Supervisors assign tasks to employees and tell employees which Order Numbers to bill their time for that task.

-32-

For example, the tasks/operation steps for the fabrication of carpet for the C-130J are as follows:

01  Process into Cost Center

02  Mark Cutouts and Profile per Shop Pattern

03  Cut and Trim Profile

04  Sew Binding on Outer Edge

05  Mark Cutouts per Pattern

06  Trim Cutouts

07  Sew Binding around Cutouts

08  Identify and Label – Stamp Pattern

09  Inspect

Most trim parts follow a similar sequence.

-33-

For most operation steps, Lockheed bills both set-up time and run time. The Shop Floor Manager program tells employees how much time should be spent on each task, which is generally the time Lockheed budgets for production of new trim parts.

-34-

While this is usually the actual time billed to the Government for new parts (the time an operation should take to perform), time billed for that operation step on replacement parts will exceed the time Lockheed itself says is the expected labor requirement, often in multiples, with different employees logging time on the same operation step for the same task.

-35-

Lockheed Trim Shop employees generally do not have the security clearance to see what other time is being charged to a task they are working on. Employees usually only see their own Task Center and not time entered by other employees under same operation steps.

## C. LOCKHEED BILLS THE GOVERNMENT FOR UNREASONABLE COSTS AND FOR WORK LOCKHEED DOES NOT PERFORM

-36-

Lockheed routinely bills the Government labor charges for Step 04 (Sew Binding on Outer Edge) even though this task is never performed in the fabrication of carpet. For example, on Order Number 8094999 for carpet spares, in November of 2006, employee Donny White charged time to operation step numbers 04 and 07 (both involving sewing) but he did not even operate the sewing machine.

-37-

In like fashion, on the same Order Number 8094999, employee E. Penrod, who upon information and belief was the sewing machine operator, billed his time to operations 05 and 06, which had already been performed by Relator in July.

-38-

In fact, all work necessary for fabrication of the carpet ordered was completed by Relator at operation 03 in July of 2006. The additional time billed by other employees to Order Number 8094999 in November of 2006 was actually spent on other tasks.

-39-

Lockheed directs its employees to bill time spent on other tasks, some not even related to production for the Government, to this Step.

-40-

Step 05 (Mark Cutouts per Pattern) is duplicative of Step 02 and is not actually repeated. Instead, Lockheed routinely directs its employees to bill time spent on other tasks, some not even related to production for the Government, to this Step.

-41-

Step 07 (Sew Binding around Cutouts) is duplicative of Step 04 and is likewise never performed, yet Lockheed routinely bills the Government labor charges under this Step. Lockheed directs its employees to bill to this Step time spent on other tasks, some not even related to production for the Government.

-42-

Set-up time is also charged for certain trim items when there is no set up required for the specific step.

-43-

During the course of his employment, Relator alerted Lockheed Management that the Trim Shop was billing for work that it did not even perform. Relator raised this concern with Mike O'Brien, now Director of Operations over all the Aircraft, with Bill Thomas and Scott Haynes, both of whom were Department

Managers over Relator, and with his supervisors, Dave Groves, Johnnie Bryson, and Jerry Hales (his supervisor at the time of his termination).

-44-

Most recently, in July of 2006, in the presence of Eddie Findley and Curtis Dillingham, Relator specifically told Supervisors Haynes and Hales, "You know we are billing for operations we don't even do." Relator was told, "Just do your job." Other employees raising concerns with management were told the same thing.

-45-

A further example of Lockheed's practice of billing for work it does not do occurred when the new C-5B was first placed in service in 1986. The Air Force discovered the plane suffered from many problems, including freezing of the potable water lines while in flight. In 1988-1989, Relator and approximately forty other Lockheed employees were sent to Travis Air Force Base in California for three months to modify the plane under the "RERP" cost-plus contract that provided Lockheed with additional money to correct the production and design flaws. Other employees were sent to Dover Air Force Base and elsewhere to retrofit the planes.

-46-

When Relator and five or six other employees from the Marietta Trim Shop arrived in California, the insulation blankets that they were supposed to install to keep water pipes on the C-5B from freezing either did not fit or had been lost in transit. These employees were then idled for days and were subsequently idle many days during their three-month stay.

-47-

Upon information and belief, Lockheed nonetheless billed the Government for all these employees' time, even when the employees were on trips to resorts like Disneyland and Lake Tahoe. Lockheed also billed the Government for all of the travel and recreation expenses of the employees, including bar tabs of over $50.00 a day for some employees.

-48-

Lockheed also submits/submitted false claims charging labor for creation of "master patterns" for trim in original production. These items are/were not subject to fixed price (except for the C-5 Aircraft series prior to January of 2005). Lockheed continues to submit claims to the Government for the fabrication of master patterns for fabric trim parts but no master patterns have been made since June of 2006. For example, in July of 2006, employees billed significant amounts

of time to creation of master patterns for C-5 RERP cargo blankets but no master patterns were created.

-49-

To support fraudulent claims for reimbursement, Lockheed directs employees to enter labor hours in excess of the time they actually spend on a specific task under a specific Order Number.

-50-

For example, Lockheed charges the Government time for hand labor for installation of the fire shield around the auxiliary power units (APU) for the Aircraft even though the process was changed to a machine application in 1991.

-51-

In 1991, Relator was the first hourly employee to receive the Company's Buck Hunter Employee of the Year Award for finding cost savings for Lockheed. Relator fashioned a machine that applied adhesive tape to secure the APU fire seal cover where the old process involved the laborious application of pieces of tape in two-to-three inch strips for a length of approximately 20 feet.

-52-

Lockheed's President estimated that Relator's invention would save $100,000 over five years in costs, yet for the last 17 years, Lockheed has continued to bill the Government for labor costs as if the process were still done by hand.

-53-

As set forth below, Lockheed also submits claims for unreasonable costs when it charges the Government labor costs for a replacement part that are multiples of the cost for the same item under fixed-cost contracts.

D.  LOCKHEED DEFRAUDS THE GOVERNMENT BY CHARGING LABOR SPENT ON FIXED-COST PRODUCTION OF NEW TRIM PARTS TO COST-PLUS ORDERS FOR REPLACEMENT PARTS

-54-

Lockheed supervisors maximize their own bonuses by charging as many hours as possible to cost-plus contracts, mainly to spares orders.  This is accomplished by charging time spent on new parts and planes to Order Numbers for spares (replacement parts) so that new production comes in under budget and Lockheed makes false claims for the time spent on new production by billing the time to orders placed by the Government for spares.

-55-

Acting at Lockheed's direction, employees record time actually spent on production parts for new planes (under fixed-cost contracts) to Order Numbers for replacement parts which are reimbursed on a cost-plus basis.

-56-

When a new production task has exhausted all of the time budgeted for that task, Lockheed supervisors direct employees to assign time to spares Order Numbers.

-57-

Acting at Lockheed's direction, employees also record time spent fabricating one replacement part under the Order Number for another replacement part.

-58-

When a task is completed before exhausting all time projected to complete an operation step, managers and supervisors will often go back and "re-open" completed steps to add more time to bill up to budgeted amounts.  Most of the time this "up billing" is for work that was not done in relation to the item referenced by the Order Number.

-59-

For the other Aircraft produced under a cost-plus contract, when the budget for a particular part has been exhausted, Lockheed directs employees to log time spent on that part on time records for replacement parts.

-60-

On other occasions, Lockheed will bill unrelated time to a spares Order Number so that the labor costs charged for the trim items ordered far exceed the amount Lockheed represented to the Government as the reasonable cost for the item under the fixed-cost contracts.

-61-

Lockheed conceals these schemes by directing its employees to record labor to show every employee is fully occupied for the total number of hours the employee works in a pay period, even though the hours do not reflect the actual time spent on tasks.

-62-

By way of example, the C-130 series Aircraft was produced under fixed-price contracts with the Air Force so that cost overruns resulted in a loss (or at least less compensation) to Lockheed.  When labor charges to produce certain trim parts

for the C-130 exceeded Lockheed's projected labor costs, Lockheed would either make less money or lose money.

-63-

Lockheed recovered these cost overruns by billing excess labor charges (time spent on original production) to replacement part Order Numbers that were billed on a cost-plus basis.

-64-

On many occasions, Lockheed personnel fabricating new trim parts for the C-130 program were ordered to charge their time to spare part Order Numbers for the C-130 program so that (i) Lockheed incurred no cost for the new parts for which the Government paid a fixed price and (ii) Lockheed could charge the Government multiples of the actual cost by charging the new production labor costs to a spares Order Number.

-65-

For example, in December of 2006, Relator completed production of 36 pieces of carpet for the C-130J pursuant to a replacement part order. However, Lockheed used the 36 sets in new airplane production to meet its requirements under its fixed-cost contract for new production and then charged additional time

to the replacement part Order Number for Relator to produce an additional 36 sets, thereby double billing the Government.

-66-

Lockheed allocates 7.39 hours as the reasonable charge under the fixed-price contract for the production of each carpet set for the C-130 planes. If this representation were reasonably accurate, the total time billed for 36 carpets would have been 266 hours. However, the actual time required to produce both sets (72 carpets) by Relator was only 80 hours, meaning the Government was over-billed for 186 hours for Relator's time for carpets for the new C-130s.

-67-

Further, since the time spent on both sets of carpet was actually billed to a spares Order Number, the Government was fraudulently billed for an additional 266 hours at approximately $148.00 per hour.

-68-

The fraud was repeated when other employees billed more hours to the same spares Order Number for work on another task. Four or five employees came to Relator and requested the Order Number for the carpets.

-69-

Upon information and belief, Lockheed charged time on the task for these four or five additional employees for one to four days each, resulting in the submission of false claims for overcharges that may have been in excess of $100,000.

-70-

For example, employee James Jenkins was running a binder and employee Curtis Dillingham was working at a sewing machine—both working on tasks other than the C-130J carpets (which had already been completed), and while on overtime.

-71-

The fraud was compounded when, upon information and belief, Lockheed re-opened the Shop Floor Manager task billing file in or around March of 2007 and other employees billed time to the same Order Number--time that was actually spent on other trim production where Lockheed had already exceeded its budget.

-72-

By fraudulently charging labor for new parts under the C-130 fixed-cost contracts to the cost-plus contracts for replacement parts, Lockheed was able to obtain payment for time and materials not allowable under the fixed-cost contracts.

When performing the exact same task under a spares order, Lockheed would bill the Government for multiple employees' time, at cost-plus reimbursement.

-73-

The result of the artifices is that Lockheed submits claims for labor charged to the fabrication of replacement parts that falsely state the labor costs associated with the part and result in overpayment to Lockheed.

-74-

On other occasions, Lockheed opens files for spares orders before a part is even ordered. Employees record time in the file and when an order later comes in for a spare part, Lockheed has the spare part order time already charged to the file that was actually spent on new parts.

-75-

Shop Floor Manager time records show a number of occasions where Lockheed opened an Order Number file and began charging time before an order for specific replacement part was placed. Upon information and belief, Lockheed charged time spent on new production to these "dummy files" until the next spares order came in for the same item. The replacement part order would be assigned the already-open Order Number and "inherit" the time already entered, plus the time for the new spare order.

-76-

For example, Lockheed's records indicate an order for carpet with a start date of November 16, 2006 was actually started and completed on or around November 1, 2006. Likewise, an order for carpet with a start date of June 29, 2006 had its time first entered on May 16, 2006 but the Order Number file was kept open until September 25, 2006 to keep charging time to the spares order.

-77-

Lockheed often fell behind on production schedules and required employees to work overtime to meet deadlines. This overtime cost was charged to spare orders to keep new planes on budget.

-78-

The time charged to the Government under spare part Order Numbers often includes overtime and double time for work done on Sundays. Relator worked many overtime hours on new parts while being directed to charge his time to a spares order. Weeks without overtime were rare.

-79-

Lockheed occasionally uses employees in the Trim Shop to assist with painting new Aircraft and painting spare parts for Aircraft that have been in

service.  On such occasions, the time spent painting is charged to Order Numbers for spare trim parts instead of for painting.

-80-

By cross-charging for labor, Lockheed obscured its overcharging for certain replacement parts, making it impossible for the Government to determine the exact amount of Trim Shop work done or charged to a given contract.

-81-

On many occasions, Lockheed personnel fabricating replacement parts for one Aircraft were ordered to charge their time to other parts or to contracts for another Aircraft.

-82-

The false claims and overcharges for trim work and trim parts alleged herein have occurred since at least the 1980s and continue through the present.

-83-

Lockheed management was aware of these practices but knowingly and deliberately took no action to end them.

## E. LOCKHEED'S FORM 1034 CERTIFICATION OF CLAIMS UNDER THE CONTRACTS

-84-

Lockheed submitted and continues to submit invoices for payment for new and replacement trim parts manufactured under the Aircraft contracts and requisitioned through Purchase Orders from the Government.

-85-

Lockheed has billed and continues to bill the United States for all costs associated with replacement parts pursuant to cost-plus contracts.

-86-

Lockheed submits electronic payment requests several times a week. Upon information and belief, each request for payment contains a certification that Lockheed was entitled to receive the amount requested under its contract with the United States. Therefore, each submission of claims under the contracts related to the Aircraft operates as a Standard Form 1034 certification.

-87-

By submitting such invoices, Lockheed certifies that the charges for and materials and labor for each trim part are correct and proper for payment. Such certifications are required as a condition of payment.

-88-

Relying on such certifications, the United States pays Lockheed for the amounts it requests in its claims for payment.

-89-

Lockheed continuously violated the Aircraft contracts by charging for unreasonable costs, charging labor to manufacture one part to the Billing Number for another part, and by charging for labor not performed.

-90-

Lockheed's claims for payment were not correct and proper for payment because they violated the provisions of the contracts.

-91-

Under its contracts with the United States, Lockheed is required to follow Federal Acquisition Regulation ("FAR") Subpart 31.2 which states that Lockheed may only charge the United States for "allowable" costs.  Therefore, with each electronic submission that certifies that all costs are correct and proper for payment, Lockheed certifies that it is billing the United States only for allowable costs.

-92-

Under FAR 31.2, a cost is allowable only when the cost is reasonable and allocable. FAR 31.201–3 provides in pertinent part:

(a)    A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

(b)    What is reasonable depends upon a variety of considerations and circumstances, including –

(1)    Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2)    Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;

(3)   The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4)   Any significant deviations from the contractor's established practices.

-93-

Under FAR 31.2, Lockheed's submission of claims to the United States pursuant to the Aircraft contracts is a certification of commercial reasonableness.

-94-

Lockheed's claims for labor charges for replacement parts that are multiples of the charges Lockheed itself identified as reasonable for the same items under fixed-price contracts are not commercially reasonable, nor are Lockheed's claims for work that was not performed or that was improperly allocated to cost-plus contracts.

F.    LOCKHEED'S VIOLATION OF TRUTH IN NEGOTIATIONS ACT

-95-

The Truth in Negotiations Act, 10 U.S.C. § 2306a (TINA), requires a contractor submitting cost or pricing data to the Government in the course of negotiating a Government contract to certify that, to the best of the contractor's

knowledge and belief, the cost or pricing data submitted is accurate, complete, and current.

-96-

In the course of negotiating and securing its contracts with the Government for production of the Aircraft, Lockheed submitted inflated cost and pricing data for production parts and replacement parts that were manufactured by the Trim Shop.

-97-

Lockheed and its employees knowingly and intentionally submitted false statements of certification to the Government that the cost and pricing data it submitted to the Government for trim parts was accurate, complete and current.

-98-

Lockheed charges the Government a flat rate of about 32 labor hours for carpet installation in the Aircraft, based on Lockheed's representation to the Government that the task takes two days labor for two employees. In fact, the work is done much faster. Lockheed Management is aware that Relator was able to install a set of carpet by himself in less than 20 hours.

-99-

By way of further example, while Lockheed represented that it requires 7.39 hours to produce a new set of carpets for new Aircraft, Relator has produced four sets in a single day.

-100-

Lockheed's false certifications to the Government violated the False Claims Act and caused the Government to make overpayments to Lockheed.

## G. LOCKHEED'S KNOWLEDGE OF ITS OWN FRAUD: UNAUTHORIZED REWORK AND OVER AND ABOVE CHARGES

-101-

When an employee finishes producing an ordered part, the part is billed to and considered sold to the Government and placed in stock at Lockheed pending installation.

-102-

Parts are examined by an inspector before installation in the Aircraft. When there is a problem (e.g., a part does not fit), Lockheed is required to submit a Quality Assurance Document ("QAD") to Quality Assurance to submit to the Government to obtain authorization to pay for "rework." Payment for the rework is charged against the current budget so the Government does not pay twice for the same item because it did not meet specifications.

-103-

In practice, when a problem is discovered during inspection, it is sent back to the hourly employee who bills the time spent repairing the part to whatever task he is currently working on or charged to the same part if the cost of labor for the rework is within the "over and above" allowance for that part. As long as the labor charge for a certain part does not exceed a certain percentage of projected cost, the Government will not review the claim. When the cost to rework a part falls within the "over and above" range, Lockheed will charge the labor needed to rework to the original part instead of generating a QAD.

-104-

For example, Lockheed manufactures a fire shield for the auxiliary power unit (part number 33537) for all the Aircraft. When the Trim Shop finishes making the fire shield it is placed in stock and billed and sold to the Government. When the fire shield is examined by a Lockheed or Air Force Inspector immediately prior to installation, and the Inspector finds the shield does not fit the airplane, it is returned to the Trim Shop, whether there is one or thirty parts to be reworked, Lockheed performs repairs and modifications to the fire shields and charges the Government for the work under different orders. Lockheed does this even if an entire set of parts needs reworking.

-105-

By way of further example, during Relator's employment, when Lockheed employees damaged carpet while installing it in the Aircraft, they would get another piece out of stock (that the Government had purchased for another plane) or cut a new one and charge the rework time to labor for installation.

-106-

When installing parts on weekends, employees who damaged parts during installation would take parts out of stock or fashion new parts in the Trim Shops while continuing to bill their time to installation, instead of creating a QAD that would keep the Government from being charged twice for production of the same part.

-107-

Because of Relator's knowledge and experience, he was often sent from the Trim Shop to installation to rework trim parts to meet inspection parameters. Instead of documenting the need to rework with a QAD, Relator was instructed to charge the labor to another task or enter an "over and above" charge.

## H.  LOCKHEED'S KNOWLEDGE OF ITS OWN FRAUD:
## RELATOR'S HISTORY OF DISCLOSURE

-108-

Relator Harris first raised concerns about Lockheed's improper billing practices in the late 1990s in a conversation with Supervisor Jerry Hales, specifically in reference to false time entries for trim carpet work on the C-130.

-109-

Within the same year, Mr. Harris discovered that Lockheed was making similar false claims for payment on other parts and other Aircraft.  He raised these concerns with his long-time supervisor, Johnny Bryson.  Mr. Bryson told Mr. Harris, "If you are concerned about it, don't do it, but it will get done."

-110-

In 1999, Mr. Harris left his job with Lockheed to work as a self-employed contractor.  He returned to his former position with Lockheed in 2002.  At that time, he was the only employee working on the F-22 in the Trim department.  He was also working on the C-5 RERP with five or six other employees.

-111-

Within his first year back, Mr. Harris again raised the same concerns about improper billing with his supervisor, Jerry Hales.  This time the part involved was a bulkhead rubber cushion for the wall behind the bunk in the cockpit of the C-130.

Mr. Hales told Mr. Harris, "Don't buck the system" and "What do you want me to do about it?" Mr. Harris then expressed his concerns to the Union President.

-112-

In late 2004 or early 2005, after speaking with co-workers Eddie Findley and Curtis Dillingham, Harris told them he was going to raise the false billing issue with Lockheed Planner, Gary Walker, who was responsible for setting up the operation steps for time billing in the Trim department.

-113-

Mr. Harris asked Mr. Walker about the process for creating operation steps and why Lockheed was billing for operations it did not perform. Walker told Harris he was not going to delete the operations that were not actually performed, stating, "I'm not going to go there."

-114-

In May or June of 2005, Harris discovered that Lockheed was submitting false claims to the Government in relation to fabrication of covers for the landing gear light on the C-130. When an order for a replacement came in, Lockheed would make and stockpile a number of extra covers but charge all the time to the part(s) actually order, so that the Government was overcharged. When a subsequent order for a landing gear light cover came in, Lockheed would pull a

cover from the stockpile and then charge time spent on other tasks to the new order, in effect charging the Government twice for the same part.

-115-

When Mr. Harris complained to Scott Haynes about the overcharging and stockpiling practice, Mr. Haynes told him to "Get out of here and get back to your place."

-116-

In 2005, Mr. Harris raised his concerns about improper billing to the Union President. Thereafter, the Union President and Union Business Representative came to talk to Mr. Harris about a supposed complaint made by another employee who complained about a comment Mr. Harris made about passing gas some six weeks before.

-117-

Mr. Harris expressed his consternation that the Union was concerned with taking action against him for such a mundane matter "when you have people falsifying records." The Union President and Representative walked away. Mr. Harris received an "Employee Performance Notice" in his personnel file thereafter, even though profane and coarse comments were frequently made, even by supervisors, without any recrimination.

-118-

In May of 2006, after Mr. Harris had suffered an on-the-job injury to his knee, Lockheed management decided to move him from trim work for the C-5 airplane to installing carpet on the C-130, a task that Mr. Harris had difficulty performing because of his knee injury. The time for the work Mr. Harris spent installing new C-130 carpets was charged to the C-5 cost-plus contract.

-119-

Upon information and belief, the decision to move Mr. Harris to a job he could not perform was made after Lockheed management began to suspect that Relator was a whistleblower.

-120-

When Mr. Harris complained that he could not continue to install carpet because it required him to work on his injured knee, management transferred Mr. Harris to the "Magic Shop" (Manufacturing Research Department) in May of 2006 to perform light duty. At that time, Mr. Harris was fully capable of continuing to perform his old job in the Trim Shop.

-121-

Protesting that he had been physically capable of performing his old job despite his injury, Mr. Harris asked Scott Haynes and Jerry Hales who they were

going to get to whitewash false charges for time. Scott Haynes walked away but Jerry Hales told him, "You let us worry about it."

-122-

Mr. Harris was asked to train employee E. Janet Penrod to take over his work. Ms. Penrod was already doing fraudulent time entry in her area and knew what Lockheed expected of her.

-123-

Upon Mr. Harris' arrival at the Magic Shop, the Shop Steward and the Shop Manager told Mr. Harris, "You will make it here if you keep your mouth shut. If you don't, you won't." Mr. Harris was kept away from documents or billing records during his assignment to the Magic Shop.

-124-

While working in the Magic Shop, Mr. Harris asked Bob Fedders to help him get a meeting with Mike O'Brien, then the Director of Aircraft Operations for the C-130.

-125-

In January of 2007, Mr. Harris was cleared to return to work in the Trim Shop.

-126-

Mr. Harris wrote a letter to Mike O'Brien, requesting a meeting to discuss his concerns about Lockheed's billing practices. Mr. O'Brien scheduled and then cancelled the meeting. Mr. Harris was terminated before any meeting took place.

## I. EVIDENCE OF LOCKHEED'S FRAUD

-127-

Lockheed is required to maintain records of materials and labor associated with the fabrication of new and replacement Trim parts for the Aircraft.

-128-

Lockheed is obligated to keep track of the labor hours it billed to the United States. As shown above, Lockheed failed to keep labor hours for new production and replacement trim parts separate and identifiable.

-129-

Lockheed has possession of the documents necessary to reveal the full extent of Lockheed's submission of false claims under Lockheed's cost-plus contracts overcharging the Government for the fabrication spare replacement parts for use on the Aircraft.

-130-

Lockheed inspectors should have completion records showing when jobs are "undone" or reopened after they were actually completed to add more labor to the task, even though the additional labor added was not expended on that step or that task.

-131-

Lockheed is responsible for maintaining the cost breakdown for each claim it submits. The cost breakdown for each submission is in the exclusive possession of Lockheed.

-132-

The Shop Floor Manager software contains records of the dates different employees performed tasks under Order Numbers for spare parts and the time each employee charged to each operation. The total time charged under an Order Number can be compared to the amount Lockheed charges for the trim items under fixed-cost contracts. Fixed-price charges can also be compared to any files that show actual time as less than the fixed-price charge.

-133-

Time records in the Shop Floor Manager software for new production of trim parts can also be compared to time records for spares orders for the same part.

-134-

Upon information and belief, Lockheed employs and has employed other schemes that are not specifically alleged in this Complaint because Lockheed has exclusive possession of the documents evidencing these schemes but that will be discovered as investigation into the allegations contained herein proceeds.

-135-

Upon information and belief, Lockheed employs and has employed other schemes that are not specifically detailed in this Complaint because Lockheed has exclusive possession of the documents evidencing these schemes.  More detailed information may be discovered as investigation into the allegations contained herein proceeds.

## V.    CLAIMS FOR RELIEF
### COUNT ONE:  FALSE CLAIMS ACT VIOLATIONS
### UNDER 31 U.S.C. § 3729(a)(1) and (a)(2)

-136-

Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth in this Count.

-137-

In the course of negotiating new contracts, renewing contracts, and modifying contracts, Lockheed knowingly submitted cost or pricing data to the

Government that was inaccurate, incomplete, and not current, in order to obtain payments pursuant to the contracts between the Government and Lockheed, in violation of 31 U.S.C. § 3729(a)(1) and (a)(2).

-138-

Defendant Lockheed knowingly and falsely represented to the Government that it was in full conformance with the terms of its Government contracts in order to obtain payments pursuant to the contracts between the Government and Lockheed, in violation of 31 U.S.C. § 3729(a)(1) and (a)(2).

-139-

Defendant Lockheed knowingly submitted false claims and knowingly created and/or submitted false records and statements to the Government in order to obtain payment in violation of 31 U.S.C. § 3729(a)(1) and (a)(2).

-140-

Lockheed management knew or should have known that the Company was submitting false claims to the Government as alleged above.

-141-

The conduct of Lockheed constitutes a continuing violation that reaches back beyond the otherwise applicable statute of limitations.

## COUNT TWO:  FALSE CLAIMS ACT CONSPIRACY
## IN VIOLATION OF 31 U.S.C. § 3729(a)(3)

-142-

Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth in this Count.

-143-

As set forth above, Lockheed has conspired with its officers, agents, and employees to defraud the United States Government by getting false or fraudulent claims allowed or paid in violation of 31 U.S.C. § 3729(a)(3).

-144-

Defendant conspired together with its officers, agents, and employees, authorizing them to take and conceal the actions set forth above.

-145-

As set forth in the preceding paragraphs, Defendant has knowingly violated 31 U.S.C. §§ 3729(a)(3) and has thereby damaged the United States Government by its actions in an amount to be determined at trial.

## COUNT THREE
## RETALIATION FOR PROTECTED ACTIVITY
## IN VIOLATION OF 31 U.S.C. § 3730(h)(3)

-146-

The allegations contained in the preceding paragraphs are realleged as if fully set forth below.

-147-

As set forth above, Relator Harris repeatedly questioned and complained to Lockheed management about Lockheed's improper billing on Government contracts.

-148-

Relator's actions, including but not limited to investigating and reporting false and fraudulent billing practices to his superiors and to the on-site auditor, are protected activities within the meaning of 31 U.S.C. § 3730(h).

-149-

Defendant Lockheed was aware of Relator's complaints about the illegal billing outlined above and was aware that Relator had reported his concerns to the on-site auditor and engaged in other protected activities.

-150-

Relator's complaints concerning Lockheed's billing practices set forth above put Lockheed on notice that Relator's complaints could lead to a *qui tam* action.

-151-

Defendant Lockheed's actions in harassing and discriminating against Relator in his work conditions and adversely affecting his ability to do his job were taken in retaliation for his reporting of the illegal billing practices set forth above and the resulting False Claims Act violations.

-152-

Lockheed harassed and discriminated against Relator in the terms and conditions of his work place, in violation of 31 U.S.C. § 3730(h), in order to intimidate him from cooperating or assisting in the investigation of this action under the False Claims Act and to retaliate against him for his past reporting actions.

-153-

Relator Harris was discriminated against in the terms and conditions of his employment by Defendant Lockheed, by and through its officers, agents, and employees, because of lawful acts done by him in the furtherance of an action under the False Claims Act.

-154-

Because of Lockheed's actions, Relator Harris was denied the benefit of working for an honest business, experienced the embarrassment of working for a company that cheated the Government, and suffered stress, anxiety, and mental anguish.

-155-

Lockheed retaliated against Relator for his actual and perceived protected activities through excessive discipline, through knowingly and intentionally assigning him work that caused him physical pain, through exiling him to the Magic Shop, and by terminating his employment.

-156-

Defendant Lockheed's actions have damaged Relator Harris in violation of 31 U.S.C. § 3730(h) in an amount to be determined at trial.

-157-

Pursuant to 31 U.S.C. § 3730(h), Relator Harris is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claim.

## PRAYER

WHEREFORE, on Counts One and Two, Relator, on behalf of himself and the United States Government, prays:

(a)     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

(b)     That Relator be awarded all costs, attorneys' fees, and litigation expenses;

(c)     That in the event that the United States Government continues to proceed with this action, Relator be awarded for bringing this action 25% of the proceeds of the action or settlement of any such claim;

(d)     That in the event that the United States Government does not proceed with this action, Relator be awarded an amount the Court decides is reasonable for collecting the civil penalty and damages, which shall be 30% of the proceeds of this action or the settlement of any such claim;

(f)     That the United States Government and Relator receive all other relief, both at law and in equity, to which they may reasonably appear entitled.

**Relator further prays under Count Three:**

(g)     That he be awarded all compensatory and punitive damages, including personal injury damages for pain and suffering, loss of reputation, back pay, and interest to which he is entitled pursuant to 31 U.S.C. § 3730(h);

(h)     That he be reinstated with the same seniority status that he would have had but for the discrimination;

(i)     That he be awarded all litigation costs and reasonable attorneys' fees pursuant to 31 U.S.C. § 3730(h);

(j)     That he receive all relief, both in law and equity, to which he may reasonable appear to be entitled; and

(k)     Relator demands a trial by jury.



Respectfully submitted,

**Joyce Thrasher Kaiser & Liss, LLC**


Kristofer R. Schleicher, Esq.
Georgia Bar No. 629327
Attorneys for Relator

Five Concourse Parkway
Suite 2350
Atlanta, Georgia 30328
(404) 760-6000
kschleicher@jtklaw.com


**Bothwell Bracker & Vann**


Mike Bothwell
Georgia Bar No. 069920
Julie K. Bracker
Georgia Bar No. 073803
Attorneys for Relator

304 Macy Drive
Roswell, GA  30076
(770) 643-1606
Mike@BBV-Law.com
Julie@BBV-Law.com